Inway, Wiersma v. Bank of the West, counsel. May I please the court. My name is Brent Robinson. I'm here on behalf of the Wiersmas. I would ask that five minutes be reserved for rebuttal. You may do so, counsel. Just watch the clock. As the court is aware, there are many issues before this court with respect to this Chapter 11 proceeding that occurred in Idaho. I would like to address first the issue of the motion to compromise a settlement. With respect to such, it's pretty clear that the Wiersmas were successful in southern Idaho. A successful dairyman, in fact, had a net worth of $5 million. And then all of a sudden, as they had improvements done on their dairy, it resulted, more particularly electrical work, it resulted in injury in the cows, which ultimately resulted in all of the cows being lost. Would the electric current go through the pasture, or was it they ran up against the fence? It wasn't fence. What happened is they did the work in the dairy itself. Oh, in the dairy. In the dairy itself, it caused the current to go into the cows. I see. And causing significant damage to the cows. There was a pending lawsuit filed in state court, but all of what was happening with respect to the Wiersmas is they could not pay their creditors because of the source of income had gone to the wayside. And so on October 1, 2001, they filed bankruptcy of Chapter 11. At that point in time, subsequent there to about four or five months, there was a mediation of the state court case. And out of the mediation came a concept where certain funds, namely a sum of 2.5 million, but as the letter reflected, that since it was in bankruptcy court, it would require bankruptcy approval, which is normal, but there was also another provision, different than typical, and that was because the 2.5 million was less than what it would take to satisfy all of these creditors who had been hurt because of this loss, that it required creditors' approval. Subsequent there to in August, special counsel filed a motion to approve the compromise and in providing such, indicated it was with respect to the Wiersmas portion for cows. The hearing, it came before the court for hearing in September. And when it came before the court, the U.S. Trustee's Office objected because it said that there was no indication that giving notice to all creditors as required to, if you look at Rule 9019 and 2002, also 2002 requires it to be 20 days before the hearing. What then occurred was a subsequent motion was filed. That happened in the first part of November. Came on before the court to be heard on November 19th. At that point in time, once again, it was a motion providing that the Wiersmas portion would be for cows. It was determined that it would be appropriate to connect a confirmation, which would then happen the last part of December. The special counsel indicated, because the court was concerned over the only thing it actually knew was what was contained in the motion. In fact, it was that day that that letter was provided, the one-page letter. The court required it to come to an agreement. It was indicated that that agreement could be put together by Thanksgiving. And so the court indicated it would give them until November 29th, which to file that agreement with the court. That agreement did not get filed with the court. It did not get filed until December 27th. And it actually wasn't even filed. That's an incorrect statement on my part.  The most important party who needed to approve this provision and approve this settlement, unsecured predators received no notice before the confirmation hearing. And therefore, what occurred in this particular case is the matter went forward. When the court looked at the agreement, the Wiersmas believed it said different and that's an altogether different issue. But ultimately, what happened in particular case... So isn't the bottom line in this situation the question of whether under 315 of Article 9 these are proceeds as to which the bank has a perfected lien? That is one of the issues because if they have a lien in these proceeds as to pertaining to cows or proceeds, then they would have the right, but that doesn't mean it ends the question because you could still take those proceeds provided the circumstances are right and create a reorganization plan which would then bring about the payment to other creditors. But I understand your argument that you're trying to limit the proceeds to the loss of the cows, but does bankruptcy law really look at that level of detail? Well, so long as the bank has a lien on everything, doesn't it reach those proceeds? Provided that they do, in fact, have a lien on everything. Article 9 indicates that there is a separate category in Article 9 which was in effect at the time of this case. And the commercial tort is a particular kind of tort. And I don't think there's any question when one looks at this kind of case, what we had here was a commercial tort. But we're not talking about the claim. The claim had matured to a settlement and proceeds. Okay. So, aren't we looking at the dollars rather than the claim itself? Well, first off, you may, and you may look at proceeds and then at general intangibles. That's the two categories which the bankruptcy appellate panel used. Let me just address that. In the case of proceeds, if, in fact, it is a commercial tort, it's like if I go out and I lend you money to buy a car. I take a lien on the car. If then all of a sudden the car is sold and I have a lien on that car, I have a lien on the proceeds. But what happens if I don't have a lien on the car? I don't have a lien on the proceeds. And my concern with what the bankruptcy appellate panel did is if it, in fact, is a commercial tort, and it is when you look at the nature of the case, and they had that not in their security agreement in any way, shape, or form, how can they now have a lien on the proceeds? If it is proceeds from cows, and that's what we're talking about because of the loss of the herd, then there's two concerns. One is it wasn't only the cows that was affected in this particular. I recognize that Bank of the West claims it is the locus of the law. It's the major thing. And, therefore, they ought to get it all. But there are all kinds of other damages which were demonstrated in the hearing that we had in September, excuse me, in July of 2002. And, therefore, the court should have done some things with compartmentalizing as to that. Now, take the question of general intangibles. That's the other way the court went with respect to general intangibles. And when it is. Before you leave that, I just want to make sure I understood what you just said. Are you suggesting that if the proceeds are the $2.5 million is attributed as a proceed from a claim for commercial tort, that that would not be subject to the bank's lien? Correct. But if it's viewed as a quantified reduction to value of the cows, then it would be subject to the lien of the bank? If, in fact, it's not a commercial tort. But I still think you have to look in the first instance as to what kind of nature is this cause of action. And if you looked at the cause of action, I don't think you could explain anything other than commercial tort. The second thing is, is that the court bankruptcy panel said it's a general intangible. Now, if general intangible includes even a commercial tort, then why do we have a commercial tort? General intangible, then it said, is because of settlement. We have to go back to two circumstances. Actually, three. One, at the time the security agreement was entered into, it makes no reference. There was no pending lawsuit. They had a right in cows. Two, the date of petition is very important. Because under 552 of the bankruptcy code, you can't get something after that. You determine and look at, at the date of petition, what did the bank, in fact, have. There was no settlement. In fact, when we argued the matter before the bankruptcy court, there was no settlement. It had not been approved. So, in other words, how in the world could it be a general intangible? And, therefore, when it's all said and done, it's A, it's commercial tort, and B, they, therefore, do not have a lien in such. Now, I want to go back to the notice requirement because I think it's a separate, different issue, and this is how. Even, let's assume for just a minute, that it was cows, and they had a lien in such. And, by the way, for what it's worth, an integral equivalent is really interesting with respect to that issue because they had a lien in cows. If you're going to make them whole, you put them back in the same posh with cows. Then, when you're talking about getting a plan confirmed, it's cows for cows because that's what they were trying to acquire. But, separate and apart from that, when this settlement came into play, it obviously wasn't going to pay everybody in full. The weirsmiths had to find a mechanism whereby they could get as much as they possibly could to every creditor and get some approval with respect to their plan. But, what they did is they chose to go to Georgia because, in Georgia, unlike Idaho, the milk gets $5 more per hundredweight. It's almost another half, again, because they have a fluid market. It's milk you drink instead of a cheese market in Idaho. When they did so, what happened was is that you have all these creditors who come to court, voting for a plan, and all the unsecured creditors, the necessary two-thirds in amount, and one-half did. And, all of a sudden, they find themselves re-voting for a plan based upon a motion which has been joined with that plan to approve a compromise for cows. And, the court, without any notice to those particular parties, what, in fact, did was it made it for cash. And, all of a sudden, what happens is then the bank gets all the cash, the court says we're not going to confirm the plan, and all of a sudden the opportunity to do what was trying to be accomplished in a lesser amount went through the window. Now, what the judge said was really interesting. He said when he was asked about the notice requirement, you've got to give them 20 days' notice, you've got to get an opportunity to be heard on this issue, what his response was, well, it was on, you could look online. But, it wasn't online until January 21st, which is 21 days, 20 days, 19 days after the confirmation hearing. And, furthermore, that's not proper notice. So, that's our first concern because this matter needs to go back because it lacked proper notice. Now, I recognize that the next issue will be, however, as the bankruptcy appellant panel said, issues moot. It's gone. If you're looking at moot, a bankruptcy court is a unique court, as this court is aware. It has powers different than other courts in that it's to protect creditors, but more particularly debtors, and those pertaining to the bankruptcy estate. It has the ability to undo what, in fact, has been done. For example, if the wills were to go through during the pendency of their bankruptcy, a divorce, and all of a sudden what happened, tried to divide their property, the court would undo it. If someone were to decide to foreclose upon their real property, as they did in this particular case, but they had to get court permission first, otherwise the court could undo it. Now, when does that become important? It's important that during the time that pending before the bankruptcy court was a motion to determine whether, in fact, it acted properly with respect to approving the compromise, special counsel runs into state court and gets the case dismissed. Now, can, in fact, the court provide a meaningful relief? Of course it can. It has to just be any possibility, some relief. And the relief it clearly can provide is it could undo that transaction. Now, the other thing that's important. Undo which transaction? The state court action. Now, the second thing that it can do, which is really important, is that this court, the bankruptcy court pertaining to these proceedings, put into a joint account held 1.4 million plus interest, which I understand is 1.5, almost 1.6 million. Also, that special counsel, if the matter ever got confirmed, was to provide 160,000, which still could come in. And there's still an issue whether if there's no settlement of the compromise, there's an additional $900,000 roughly that can come back from special counsel. All of that could still happen. So, you certainly can create meaningful relief whenever it has to be as a possibility.  One of the approaches that was taken then by the U.S. Trustee's Office, and was taken by the Bank of the West, was that this matter could not be, the matter of the loan rights, could not be heard because, in fact, of what happened with respect to the first appeal. In September, there was a decision. We filed an appeal. So did Ferndale. Thereafter, it was determined that it really was probably not a final, but an interlocutory. And therefore, even when the BAP asks us for certain things, it was determined that they saw it as well that way. That was certainly the impression I had and the impression, my understanding, Ferndale had. And so we did not do anything with respect because we knew that it had to go further steps. It was our position, even though the BAP says they saw it as a final appeal, it really was. I mean, excuse me. Yeah, it was final. It really was interlocutory because there were other things that had to happen. Judge Pappas, in his decision, acknowledged that there still was not approval of the settlement. And furthermore, there's altogether all those circumstances pertaining to confirmation that's going to affect these parties. And therefore, as the court understands, it should not be two runs to this court and all the time it takes. It really ought to be one run. And this run is the run we're before this court. What was the bank's position at that time? I'm sorry, your Honor. Did they take a position that it was interlocutory or final? The impression of the brief that was filed in response to the bankruptcy appeals questions was, as I read it, yes, that they kind of saw it as interlocutory, or at least it ought to be stayed. And therefore, that's the reason why we didn't think there was any issue about it. I'm out of my time. Thank you. Counsel? We'll hear from the other side. Good morning, your Honors. My name is Kelly McConnell, and I am counsel for Bank of the West. I have agreed with counsel for the United States Trustee's Office to split our 20 minutes where I take 13 minutes, and he would have the remaining seven. May it please the panel, the debtors in this case, the Weirsmann Dairy, obtained an operating line of credit from the Bank of the West and granted to the bank a secured interest in the assets of the dairy, including the dairy herd, milk, milk proceeds, contract rights, general intangibles, and proceeds of all those things. From the Weirsmann's troubles, several issues arise, but I would like to begin my argument with comments about this Court's jurisdiction over the issues related to the secured status order, as we have called it. That is the September 2002 bankruptcy court order deciding that the bank had a valid security interest in the settlement proceeds from the Geithson lawsuit. The debtors filed a timely appeal to the secured status order, which was later dismissed for failure to prosecute. Some months later, the BAP reopened the dismissed appeal. In reopening the dismissed appeal, Judges Parris and Marler found that it was not, in fact, the BAP's intent to dismiss for the stated reason of failure to prosecute. Judges Parris and Marler found the BAP really intended to dismiss the first appeal on the grounds that the secured status order was interlocutory. Therefore, under that opinion, the dismissal order was mistaken. Judge Grant dissented from this portion of the BAP opinion, stating that it was, in fact, the BAP's intent to dismiss for failure to prosecute and that there was no mistake. This Court, in reviewing this issue, is not bound by the BAP's findings on what those orders meant and reviews the matter de novo. Your position is that the bankruptcy court order is final or not final? My position is that the bankruptcy court order is a final order. Didn't the bank take an opposite position earlier before the BAP? No, Your Honor. And I would dispute counsel's interpretation of the bank's brief on that point. In fact, what the bank did was file a brief saying that it may make more sense to hold the appeal in abeyance pending final resolution of the confirmation issue so that all issues could be heard together. There are no statements in that brief about whether the order was final or interlocutory. In looking at whether or not the BAP made a mistake in its order of dismissal, I would call the Court's attention to Judge Grant's dissent as being very significant. And the reason it's significant is because two of the orders related to that dismissal were, in fact, issued by Judge Grant. The first order was the January 17, 2003, order of refinality issue, where Judge Grant said we need counsel to address certain issues about finality, and if those issues are not addressed, dismissal may ensue. Then along with Judges Ryan and Klein, he wrote the March 6, 2003, order denying request for judicial review, where he again made clear that the case was being dismissed for a failure to prosecute. The BAP did not make a mistake in its dismissal of the first appeal for failure to prosecute, and Judge Grant's dissent clearly states that there was no mistake, given that he was involved in the underlying orders. I believe that interpretation is entitled to significant weight. The BAP relies for its authority in correcting its mistake by asserting jurisdiction on the case of Inri Cisneros. This reliance is misplaced. The primary issue in the Cisneros case was whether the bankruptcy court could reopen the case to revoke a discharge that was granted based upon a mistake of facts made by the bankruptcy court. The court found that, in fact, the court did have the authority to correct its mistake. However, in that situation, there is an actual statutory grant of authority for the bankruptcy court to reopen a case and revoke a discharge. No such statutory authority exists here, and, in fact, there is no case law that says a court's mistake is the basis to assert jurisdiction in the first instance. Counsel, what's the significance of our resolution of this particular issue in terms of the larger case? If we agree with the bank's view on the proceeds for that issue, do we need to get to this? To the jurisdiction issue? I actually believe the jurisdiction issue comes first. The secured status order is a final order, and that the court really doesn't have the authority or the jurisdiction to even review that order. So in that sense — Because of what? Because of the lapse of time at that point, or that we have no jurisdiction over the matter in any event? In any event. Over the secured status order. That is correct. The secured status order — Does it not? The secured status order — there were a couple orders at issue here. The secured status order is the one that found that the bank had a valid security interest in the proceeds. Right. Correct. So — I call that the proceeds issue. Correct. Then in that sense, that would be correct. And obviously you and opposing counsel disagree on the merits of that issue. That would also be correct. With respect to whether that's a final order, I would call the attention of the court to the Ingrie Prestige Limited Partners case, where there was a challenge to a creditor's claim based upon an alleged violation of the California One Form of Action rule. In that case, the court found that the determination that that creditor was unsecured because of the violation was a final order. I'd also like to point out that the secured status order should have come out of an adversary proceeding and not out of a contested motion. The parties waived the right to go forward by adversary proceeding. Those issues are standalone issues. Now, it's true that confirmation of the plan did depend upon whether the bank was secured or not. However, there are no issues related to whether or not the bank was secured that any bankruptcy issue impacted. In other words, that was a complete determination. There was nothing further for the judge to do. And Judge Pappas stated in the record that it was his intent that that was a final order. The other basis for jurisdiction the court has asserted was the special circumstances doctrine. And as we point out in our brief, the court, in fact, relied upon a case authority, which has since been limited. The appropriate United States Supreme Court authority is the Osternet case, which requires two specific points, and that is that the appellant timely take some action and that that action is based upon an affirmative but inaccurate representation made by a judicial officer. Why would the bank have a security interest in all of the proceeds when it took a considerable amount of time for the dairyman to negotiate the settlement? I'm sure there were attorney fees that had to be paid, and there were a lot of expenses that the dairyman had. Now, why should the bank receive the entire amount of proceeds? Your Honor, that is a good question, and there's a couple of responses to that. The first response is that both Judge Pappas and the BAP decision go through great lengths to analyze what the damages were from the underlying guides and settlement. In fact, damage to the collateral, only damage to milk and milk proceeds, still exceed the amount of money that the bank ultimately recovered, the $1.5 million that is on deposit. The Weersmans were claiming something like $6.5 million in total damages. If you parcel that down to exactly the bank's collateral, that amount still exceeds what was actually received. The second point to that, I'd like to – Receive, receive. What was the amount of their lien? Well, the amount of the bank's claim is about $2.5 million, and from the settlement of $2.5 million with Geitzen, attorney's fees were paid, leaving $1.5 million. So the bank is still undersecured. With respect, if you look at the other side of what the Geitzen lawsuit itself was, the Weersmans – It was a claim for $6 million, but – That's correct. Obviously, a lot of suits have a very high prayer that they only expect to – In fact, in this case, the parties stipulated to a set of facts as to what they believed those damages were arising out of. And I don't have the page, but the BAP decision does recite that stipulation of facts where the specific amounts per claim are set for. For example, there's a light item, loss to cows, $2.5 million. There's a light item, additional labor, $71,000. And what I'm saying is that just the loss to cows, which was the bank's collateral, as alleged by the Weersmans, that amount still exceeds what was ultimately recovered. The other point to raise in answer to that question is to call the court's attention to the Inree Tower Air case. And in that case, there was damage to an aircraft, and the aircraft engine was repaired. The bank repossessed it and sold it. And then in addition to that, there was an insurance payment made for the repair costs. The argument was made, it was very similar to the arguments being made by the Weersmans now, that the value of the collateral in addition to the value of the proceeds was not something that the creditor was entitled to. And the Inree Tower Air Court found that, in fact, the bank had a secured interest in the proceeds as an independent basis for its secured claim and was entitled to recover both. Did the settlement include anything other than tangible objects, such as goodwill, loss of a business goodwill? Is the court referring to the Gietzen settlement? What's that? Is the question related to the Gietzen settlement or the Inree Tower Air case? The Gietzen settlement. Well, the settlement between the dairyman and the electrical company. Did that settlement include any intangible items, such as loss of goodwill? Your Honor, I don't recall that being a specific line item. If it did, would that make a difference? No, it would not. Why not? Because the amounts of the line items — You only insured tangibles. You didn't insure intangibles. Well, as a matter of fact, the bank did have an interest in general intangibles. However, I would say that the line items, the reason it doesn't matter is that the line items that do relate exactly to the bank's collateral still exceed the amount that was recovered. Counsel, you're down to seven minutes, which is what you indicated you'd share your partner's time with.  Thank you. May it please the Court, my name is Knight Elsberry. I'm an attorney with the Department of Justice. Here on behalf of the United States trustee, Isabelli, my name is Eileen Lischinski. Bankruptcy courts under Section 1112B of the Bankruptcy Code have broad and great discretion to dismiss a bankruptcy case for cause. Cause is the only standard. There are enumerated examples of cause, but a bankruptcy court may find cause in facts that go beyond those examples. What is the interest of the trustee in this case? The United States trustee under Section 28 U.S.C., Section 586, is charged with overseeing the administration of bankruptcy cases, and under Section 307 of the Bankruptcy Code has standing to appear and be heard on any matter within a bankruptcy case. Furthermore, Section 1112B specifically says the United States trustee may be a movement seeking dismissal or conversion of a case under the law. But is the government representing a class of creditors? I'm trying to zero in on why the government would get involved in a case like this. The United States trustee is interested in the efficient administration of bankruptcy cases. And when a case languishes or when a case no longer serves a reorganizational purpose, the United States trustee may become involved. The United States trustee in this case became involved very early on in February of 2002 when the United States trustee moved to dismiss the case for reasons that focused at that time principally upon the fact that these debtors had failed to file monthly operating reports, which were essentially reports of their income and expenditures, cash flow reports. They attached bank statements. And as part of the United States trustee's duties to monitor bankruptcy cases, to seek out fraud, that sort of thing, each month the United States trustee will review these sorts of financials from a debtor, and this debtor had been neglectful in doing so. The United States trustee has a duty only over bankruptcy cases? That's correct. What is trustee only? The United States trustee is different from a trustee in, say, a Chapter 7 case or a Chapter 13 case, a private trustee. The United States trustee is a senior official of the Department of Justice appointed by the Attorney General. There are 20 or so in various regions around the country. In fact, one of the wives of one of our colleagues was a U.S. trustee in the Central District. That's correct. The question I have is what is the current interest? I think that's what we're all interested in. What is the current interest or focus of the U.S. trustee to argue that there's no jurisdiction,  I'm prepared to rest on our briefs with respect to the jurisdictional issues. And we can see that there's jurisdiction over part of this. The jurisdiction is lacking as far as the secured status order, that September 20th order, and as regarding the order approving the settlement of the Geissen litigation. Both were untimely. I'd be happy to answer questions if you'd like, but the other interest of the United States trustee is in defending the court's dismissal of this case, which was in the form of granting the United States trustee's motion to dismiss. And in that respect. I have one more question. I'm always curious about what, I mean, apart from the interest in making the courts function properly, does the trustee incline toward a certain class of debtor or toward the creditors in general or something else? The United States trustee is not biased in that respect. In this case, I would note, since it does speak to that issue a little bit, that a committee of unsecured creditors was formed by the United States trustee, and oftentimes in cases an oversight monitoring negotiating role is undertaken by that committee of unsecured creditors. In this case, the committee, although formed, was inactive. In such a situation, the United States trustee would often be extra vigilant. But you're appearing on the same side as the bank in this case. We are sitting at the same table. I don't think the government sides with the bank in that respect. Your interests diverge. Aren't you arguing pretty much their issues or not? Well, for instance, we did not. Do you agree with their point of view on a secured status order? We did not take a position. Well, we took a position as to the lack of jurisdiction because of the lack of timely appeal of that. But as far as the merits of that go, the United States did not take a position there. Similarly, the United States trustee did not take a position on the settlement order. We merely noted those as jurisdictional issues because we recognize that this court has the ability to address jurisdiction at any time. As far as substance goes, it is the court's order dismissing the case that we have strong views on. Do you keep statistics on how many cases you get involved in per year? Every one. Only one? Each and every case, the United States trustee has a role in each and every bankruptcy case in the United States. Well, you file court documents in favor of one side or the other in every one of those cases? The United States trustee files documents in many, many cases. In more routine Chapter 7, Chapter 13 individual consumer debtor cases, the United States trustee will have a more limited role. However, even in those cases, there are plenty of opportunities for fraud, and the United States trustee will become involved. For instance, just last week, such a case was argued before the Supreme Court by the Solicitor General on behalf of the United States trustee. It is a significant role. As far as dismissal goes, this court found that there would be, in dismissing this case, found that there would be no substantial purpose served by allowing these debtors to present a third amended plan, nor, frankly, any other plan, to the court. This was after the debtors had been in bankruptcy for 18 months, after the debtors had filed four plans of reorganization with the court, all variants on the same thing, and none of them comporting with the bankruptcy code, i.e., none of them were confirmable. And this court, after 18 months of giving the debtors every opportunity, said that no further purpose would be served. The purpose of Chapter 11 — Does the bankruptcy trustee have a role in perhaps helping the debtor work out some sort of a plan, or do you just come in and just say, this plan's no good, this plan's no good? To a limited degree, the United States trustee is an informational resource, but the United States trustee is not a proponent of plans and does not assist debtors in developing plans. All right. I think we have your briefs very much in mind, Counsel, and you can be assured that we will consider those issues carefully. Sure. It looks like there's a little remaining time. Would it be possible to — No, no, no.  Thank you, Your Honor. Thank you, Counsel. Mr. Robinson? Thank you. May I please the Court again? This was a reorganization. The difference between a reorganization and a Chapter 7 is that you take the assets and that you pay the secured creditors a certain portion, you pay the unsecured creditors, and everybody typically gets something, and what you're doing is you're reorganizing the debt. And that's important because of the kind of things that happen with respect to this case. The question was posed, was this settlement — well, what was it? Well, it was a settlement of everything. And, in fact, the BAP went through and talked about milk loss, accessory placements, quality loss, diminished herd size, miscellaneous cost, future losses, labor. Many of those fit outside of what would typically — what you would say would, in fact, be the collateral of the bank. In this particular case, Your Honor, it's our position that the — when you even talk about proceeds, if it's cows, it was well beyond that which was settled. The second thing I think is really interesting is it surprises me, Your Honor, that the U.S. trustee is not in here arguing that notice did not occur correctly with respect to the motion to approve the compromise. In September 2002, that's what they brought before the Court. And yet just three days before the confirmation hearing, it gets totally changed, and the trustee is doing nothing or saying nothing with respect to such, which is clearly what position they should take, because they took it beforehand. With respect to the lane rights, I love that aircraft case in Retowers, because that's a case where, in fact, what the Court found is the language of the agreement included the insurance proceeds. In this particular case, that is not the case. There is no language with respect to the commercial torque. And that clearly, when you look at what happened, there was no contract with these people to do the electrical work. They merely were asked to come and do the work and did it wrongfully. The next item, Your Honor, with respect to this matter, is the issue on the appeal. The appeal was, in fact, timely filed with respect to the September order. The Court, in that particular case, referring to the Bankruptcy Appealment Panel, said in issuing its order denying motions to dismiss appeal, said this. It said, the bank's response suggested that further proceedings in bankruptcy, including a plan and dispute as to the amount of the bank's secured claim, could affect whether the appeal would be pursued. If that doesn't sound like interlocutory, I don't know what is. And, in fact, the questions which were asked and posed to us in a December 2, 2002, clerk's order, were why the order on appeal constitutes a final appellate order. Two, why the leave to appeal should be granted. Three, in either case, why these appeals should not be stayed pending the outcome of the confirmation hearing. All indicating, once again, it was interlocutory. Counsel, would you address the confirmation issue? As I look at the record, there were four separate plans proposed. Is that correct? There were, Your Honor. And what happened, the only one, the Second Amendment plan was the only plan that went before the Court for confirmation. The other two plans were done as what will happen as you work through and work agreements with parties and things and get it more refined. Why was the Court wrong in its non-feasibility conclusion? First off, the Third Amendment plan that came before the Court took every issue, every issue that the Court was concerned about in the Second Amendment plan, every one of them, and answered it. It was concerned about indubitable equivalent. And, therefore, what happened was is we gave, agreed to give the bank $210,000 cash and give them a lien in the same amount of cows that we proposed in the Second Amendment plan. Secondly, we were going to reduce the interest rate. We were going to work it out so that there was no concern over appeal. There was going to be someone there who had experience in Georgia. Every one of those issues was worked out through the Third Amendment plan. And yet the Court ignored giving us the opportunity to show, you raised the issues that suggest this plan lacks these things. We've answered them. Now, let us go forward. And the Court refused to let us do so. Now, with respect to feasibility, I recognize, Your Honor, that could be a question of fact. We think it's a question of law because we don't think that the Court applied the appropriate approach. And the reason why is because in this particular case, it got so caught up in the fact that it was going to Georgia and these people doing the same thing that they had done in Idaho that it couldn't get beyond that. Because clearly they met the test. They were dealing with an expert that presented the evidence that showed that they were justified in what they were trying to accomplish. I'm through. Thank you very much, Counselor. The case just argued will be submitted for decision.
judges: Ferguson, O'scannlain, Fisher